UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

L-3 COMMUNICATIONS                                    CIVIL ACTION
WESTWOOD CORP.

VERSUS                                                NO: 06-0279

JOSEPH EMILE ROBICHARUX, JR.                          SECTION: "S" (1)
ET AL.

## ORDER AND REASONS

IT IS HEREBY ORDERED that L-3 Communications Westwood Corporation's motion

for a preliminary injunction is **DENIED**.  (Document #2.)

IT IS FURTHER ORDERED that L-3 Communications Westwood Corporation's

motion to dismiss the defendants' counterclaim, pursuant to Federal Rule of Civil Procedure

12(b)(6), is **DENIED**.  (Document #19.)

## I. BACKGROUND

L-3 Communications Westwood Corporation (L-3) provides services, products, and

systems to the maritime and shipbuilding industries.  The systems include piloting and

navigation systems, electrical systems, water purification systems, and damage control systems.

L-3 supplies the infrastructure, the computer hardware, and particularized software, based on its

core software, to the shipbuilder or outfitter to install on a vessel to automate the functions of the

vessel.

On May 25, 2000, SPD Electrical Systems (SPD), a corporate affiliate of L-3, purchased the assets and liabilities of Electronic Design, Inc. (EDI).  Emile Robichaux, the principal owner of EDI, entered into an employment agreement with SPD.  On the same date, SPD hired Dennis Robichaux, Emile's son, and Trudy Robichaux, Dennis' wife, to fill senior supervisory positions at its EDI division.  On December 31, 2003, SPD sold the assets and liabilities of the EDI division to L-3.

Emile's employment with SPD terminated in September 2003.  Although his employment agreement contained a non-compete clause, Emile began to compete with L-3 through his company, Brandywood Corporation (Brandywood).  On November 1, 2004, L-3 learned that the United States Navy awarded a contract to Brandywood for a shipboard electronic system (contract No. N00104-05-C-7012).  The contract was canceled almost immediately after it was issued.

Guy Hardwick, L-3's vice-president of program development, began an investigation of ethics violations regarding Brandywood, which led to various e-mails among Dennis, Trudy, Emile, and Brandywood.  L-3 reviewed e-mail traffic and computer files used by Dennis and Trudy to determine whether they had complied with L-3 policies on the use of proprietary data, namely Corporate Policy No. 307 (Security and Information Asset Protection) and Corporate Policy No. 001 (Ethics and Business Conduct).  L-3 alleges that the review of e-mail traffic indicates that Dennis and Trudy had copied certain documents, including lists of parts, bills of materials, random lists, and job costing information for many of the systems that L-3 designed,

2

as well as documents used to manage operations such as human resources forms, quality manuals, quality assurance procedures and checklists, and engineering drawing templates.  In January 2005, L-3 terminated the employment of Dennis and Trudy.

L-3 required Dennis and Trudy to return the DR laptop and the TR laptop, which Dennis and Trudy had used on trips to project sites and other locations.  L-3 hired a computer forensics firm, Stroz Friedberg, L.L.C. (Stroz), to determine whether any data from L-3's computers had been sent outside of L-3 or had been copied from L-3 computers.  Michael Younger of Stroz started his review in July 2005, but the work was not completed until January 2006 because of disruption caused by Hurricane Katrina.

Stroz discovered that, on December 23, 2004, Dennis and Trudy backed up the contents of their laptops by connecting a portable external storage device with a 120 GB hard drive to the USB port of the DR laptop.  Backup log 01.log showed that over 110,000 of L-3's files had been copied from the DR laptop to a portable external storage device as part of the backup process.  Further, on December 24, 2004, the same portable external storage device was connected to the USB port of the TR laptop and used to copy over 130,000 L-3 files from the TR laptop.  L-3 had not authorized Dennis or Trudy to create any copies of information and software in the memory drives of the DR and TR laptops.[1]

---

[1]     L-3 alleges that the files included the source code for Machinery Control System (MCS) software for vessels in the Fisheries Research Vessels (FRV) class, the MCS software for vessels in the Military Sealift Command–Fast Sealift (AKR) Class, the MCS software for vessel in Auxiliary General Ocean Research (AGOR) Class, the MCS software for vessels in Dock Landing Ship (LSD) Class, the MCS software for vessels in Auxiliary General Ocean Surveillance (AGOS) Class, the Dynamic Positioning Systems (DPS) software, the Autopilot and Electronic Chart System (APECS) software, and the Electronic Chart Systems (ECS)

Trudy and Dennis admit that they made a backup of the laptops to support the work they performed at home,[2] but allege they never used it after they were fired.  Trudy did not want the backup drive in the house because she was afraid of L-3's threat of litigation, and the hard drive was taken to Emile's home in Arabi, Louisiana.   Dennis  and Trudy admit that, immediately after their termination, they looked at the USB external backup drive because they wanted to preserve information if L-3 fulfilled its threat of litigation.[3]

On February 1, 2005, Dennis and Trudy formed Robichaux Automation and Control, Inc. (RAACI) to provide automated systems for vessels.  Because neither Dennis nor Trudy had signed a non-compete agreement with L-3, RAACI bid for and obtained the contract to provide the automated systems for the third shipset for the Fisheries Research Vessels (FRV).  L-3 had provided the automated systems for the first and second shipsets and submitted a bid to provide the third shipset.

In February 2006, Trudy and Dennis made their current computers available to L-3's counsel for imaging by Younger.  See Plaintiff's exh. 21, vol. 1.  In order to narrow the focus of approximately 240,000 files, Younger imaged the computers and conducted a "hash value"[4]

_____

software.

[2]    There is no question that Trudy, Dennis, and other employees worked on their computers from home.  Trudy was permitted to work part of her day from her home in order to devote time to her young family.

[3]    The hard drive has not been examined because it was corroded by the flood waters of Hurricane Katrina.

[4]    A "hash value" is an electronic fingerprint.  The data within a file is represented through the cryptographic algorithm as that hash value.  In order for two hash values to match,

analysis, regarding files in nine categories identified by Hardwick,  to determine if the files on

the laptops matched any files on the defendants' computers.  Younger discovered that the hash

values of some of the files matched and conducted a "dedupe" process to remove all duplicate

copies across the multiple Robichaux media.  According to Younger, the deduped lists do not

represent the universe of files that were backed up, but include Hardwick's nine categories of

files and all source code, including the source code of third-party vendors.

L-3 filed a complaint against Emile, Brandywood, Dennis, Trudy, and RAACI under the

Computer Fraud and Abuse Act, 18 U.S.C. § 1030 (CFAA); the Louisiana Uniform Trade

Secrets Act, La. Rev. Stat. 51:1431-39; and the Louisiana Unfair Trade Practices and Consumer

Protection Act, La. Rev. Stat. 51:1405-09 (LUTPA).

The defendants filed a counterclaim asserting a claim under LUTPA.  The defendants

contend that this lawsuit was filed to thwart competition by the defendants in providing similar

services.  The defendants seek reasonable attorney's fees and costs, pursuant to La. Rev. Stat.

51:1409(A).

L-3 filed a motion for a preliminary injunction, seeking an order that bars the defendants

from using computer data, confidential information, and trade secrets.  L-3 also filed a motion to

dismiss the defendant's counterclaim.  The court held a three-day hearing on the motion for

preliminary injunction.

## II. DISCUSSION

### A. Preliminary Injunction

the files must be identical for every character and every line.

**1. Legal standard**

"To be entitled to a preliminary injunction, the applicant must show (1) a substantial likelihood that he will prevail on the merits, (2) a substantial threat that he will suffer irreparable injury if the injunction is not granted, (3) his threatened injury outweighs the threatened harm to the party whom he seeks to enjoin, and (4) granting the preliminary injunction will not disserve the public interest." Lake Charles Diesel, Inc. v. General Motors Corp., 328 F.3d 192, 195-96 (5th Cir. 2003). A preliminary injunction is an extraordinary remedy, and the party seeking the injunction must clearly carry the burden of persuasion on all four requirements. Id. at 196.

**2. Computer Fraud and Abuse Act**

L-3 alleges that the defendants intentionally accessed the computer; exceeded their authorization because policies prohibit access to proprietary information except to fulfill duties as employees; and caused a loss of trade secrets, namely source codes and proprietary information, that L-3 spent millions of dollars to develop or to acquire.

The CFAA is a criminal statute, but it provides for a civil right of action. Section 1030(g) of CFAA provides in relevant part:

> (g) Any person who suffers damage or loss by reason of a violation of this section may maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief. A civil action for a violation of this section may be brought only if the conduct involves 1 of the factors set forth in clause (I), (ii), (iii), (iv), or (v) of subsection (a)(5)(B). Damages for a violation involving only conduct described in subsection (a)(5)(B)(I) are limited to economic damages.

 "[T]he term 'damage' means any impairment to the integrity or availability of data, a program, a system, or information."  18 U.S.C. § 1030(e)(8).  "[T]he term 'loss' means any reasonable cost

to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service."  18 U.S.C. § 1030(e)(11).  "The meaning of 'Loss' both before and after the term was defined by statute, has consistently meant a cost of investigating or remedying damage to a computer or a cost incurred because the computer's service was interrupted."  See Nexans Wires S.A. v. Sark-USA, Inc, 319 F.Supp.2d 468, 475 (S.D.N.Y. 2004), aff'd 166 Fed. Appx. 559 (2006).

A civil action may be maintained under any of the subsections of § 1030 if it involves one of the factors listed in subsection (a)(5)(B).  Fiber Systems Int'l, Inc. v. Roehrs, 470 F.3d 1150, 1157 (5th Cir. 2006).  The only applicable section of (a)(5)(B) is (a)(5)(B)(I), which provides:

> (a) Whoever –
>  . . . .
>    (B) by conduct described in clause (I), (ii), or (iii) of subparagraph (A),[5] caused (or, in the case of an attempted offense, would, if completed, have caused)--

[5]        (5)(A)(I) knowingly causes the transmission of a program, information, code, or command, and as a result of such conduct, intentionally causes damage without authorization, to a protected computer;
    (ii) intentionally accesses a protected computer without authorization, and as a result of such conduct, recklessly causes damage; or
    (iii) intentionally accesses a protected computer without authorization, and as a result of such conduct, causes damage; and
Subsection (a)(5)(B) does not limit relief to claims that are based only on subsection (a)(5)(A). See Fiber Systems, 470 F.3d at 1157.  Rather, a claim may be brought under other subsections of § 1030 if one of the tests of (a)(5)(B) is met.  Id.

7

(I) loss to 1 or more persons during any 1-year period . . . aggregating at least $5,000 in value; . . . .

In its motion for a preliminary injunction, L-3 references § 1030(a)(2)(C) as the subsection upon which its claim is based.  The subsection provides an action against "(a) Whoever . . . (2) intentionally accesses a computer without authorization or exceeds authorized access,[6] and thereby obtains . . . (C) information from any protected computer if the conduct involved an interstate or foreign communication."

The court finds that L-3's allegations of loss of trade secrets and lost profits are not contemplated by the CFAA.  Losses under CFAA are compensable when they result from damage to a computer system or the inoperability of the accessed system.  See Civil Center Motors, Ltd. v. Mason Street Import Cars, Ltd., 387 F.Supp.2d 378, 381 (S.D.N.Y. 2005) (citing Nexans, 319 F.Supp.2d at 478).  "[C]osts not related to computer impairment or computer damages are not compensable under the CFAA."  Id. at 382.  The language of CFAA permits recovery for loss revenue "only where connected to an interruption of service."  See Nexans, 166 Fed. Appx. at 562.  There is no allegation that there was damage to L-3's computer or an interruption of service in this case.

Because L-3 has not asserted that there was damage to their computers or an interruption of service, it has not alleged a cognizable loss under the CFAA.  Accordingly, L-3 has not demonstrated a likelihood of success on the merits of the CFAA claim.

---

[6]   "[T]he term 'exceeds authorized access' means to access a computer with authorization and to use such access to obtain or alter information in the computer that the accesser is not entitled to obtain or alter."  18 U.S.C. § 1030(e)(6).

8

### 3. Trade Secrets Act

L-3 contends that its source code constitutes a trade secret, which the defendants have misappropriated.  L-3 contends that RAACI could not have submitted a bid for the automated system for the third shipset at the price that it did and within the time frame that the client required without the use of L-3's trade secrets, especially the source code for the FRV Class Machinery Control Systems (MCS).  L-3 asserts that it spent almost $500,000 to develop the FRV Class MCS source code, and that Dennis and Trudy obtained it illegally from L-3.

The defendants contend that the information they are accused of taking is not a trade secret or proprietary information because the software was 1) purchased "off of the shelf" from other software manufacturers; 2) developed for the United States government, which acquired unlimited rights; or 3) contained information that was made public by other means.  The defendants maintain that RAACI used no proprietary L-3 information from files or computer data, but that the information which it used is owned by the United States government to maintain and repair vessels and to bid on other work.  The defendants argue that the government hired RAACI to maintain and repair the software on some of its vessels and permitted them to view and copy the software in order to perform the work.  The defendants contend that this is not unique to RAACI, and other competitors of L-3 may be afforded the same opportunity.  The defendants contend that the government acquired unlimited rights to data, including software, provided by L-3 and its predecessor SPD under the Federal Acquisition Regulation civilian clause.  The defendants argue that L-3 did not take the required steps to claim limited or restricted rights in the software by marking the data with the required restricted rights legend.

Because the government acquired unlimited rights, the defendants argue, it acquired the right to use, duplicate, release, or disclose technical data or computer software in whole or in part in any manner or for any purpose or to permit others to do so.  See Department of Defense Federal Acquisition Regulations, 252.227-7013(a)(19); 52.227-14(a).   Alternatively, the defendants contend that, if there are trade secrets, they were not misappropriated.

"In order to recover damages under the Louisiana Uniform Trade Secrets Act, [La. Rev. Stat. 51:1431-39], a complainant must prove (a) the existence of a trade secret, (b) a misappropriation of a trade secret, (b) a misappropriation of the trade secret by another, and (c) the actual loss caused by the misappropriation."  Computer Mgmt. Assist. v. Robert F. DeCastro, Inc., 220 F.3d 396, 403 (5th Cir. 2000).  The Act provides the following relevant definitions:

> "Trade secret" means information, including a formula, pattern, compilation, program, device, method, technique, or process, that:
>     (a) derives independent economic value, actual or potential, from not being generally known to and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use, and
>     (b) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

La. Rev. Stat. 51:1431(4).

> "Misappropriation" means
>     (a) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
>     (b) disclosure or use of a trade secret of another without express or implied consent by a person who:
>         (I) used improper means to acquire knowledge of the trade secret; or
>         (ii) at the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was:
>         . . . .
>         (bb) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use.

10

La. Rev. Stat. 51:1431(2).

### a. Plaintiff's exhibits 84 and 85

At the hearing, Younger narrowed the scope of the alleged "trade secrets" and testified that defendants' exhibits 84 and 85 represent the universe of source code alleged to be misappropriated.  Younger could not testify that Trudy and Dennis had copied the files in exhibits 84 and 85 from the L-3 laptops, only that they existed on both media.  Trudy and Dennis analyzed every file that appeared in exhibit 84 and 85 in order to justify the presence of the files. Trudy testified that the list developed by Younger shows that they did not have any of the challenged source code except AGOR MCS source code.  The remaining items on the list represent files that are available from third parties for purchase or for demonstrative purposes.

The following testimony was provided by Dennis at the hearing.  As to exhibit 84, " Source Code Summary for all ES numbers (minus ES-12(b)) Deduped," Dennis testified that the first file, "group. dbk." is a file that is installed on a computer by an off-the-shelf program called In-Touch.  Dennis and Trudy contacted the local distributor and purchased the software because the software was required by the contractor, Halter Marine, to be demonstrated in a test for the third FRV shipset.  Dennis testified that the software was not installed from the L-3 laptops, but was provided by the software manufacturer, Wonderware.

Beginning with the second line of the list, "resource.h," through "Cpu.cfg, COMPILE.H" through "steering.h," "initialize2.cpp" through "VITAL.H," and "network.cpp" through "PUMP.H," the files represent AGOR source code that was provided by personnel of the KILO MOANA.  The defendants state that the software did not come from the external device,

11

which is the subject of the litigation.  Dennis testified that EDI originally provided and delivered multiple software packages to AGOR 26, KILO MOANA, including the source code, executable code, and object code.  Those codes currently reside on the KILO MOANA.  Dennis and Trudy were called to the vessel in Hawaii to perform five or six service calls while they were employed by EDI, and in 2006, Dennis made a service call to the KILO MOANA for RAACI.  The personnel of the KILO MOANA gave him the software to take home and use to correct future glitches or answer questions without the necessity of flying to Hawaii each time.  The KILO MOANA has since made a hard copy, which is stored on land.[7]

Dennis was not familiar with the next  file, "recovcc.def."  He searched the internet to try to determine the origin and could not find it on any of the RAACI media.  He believed that it operated a Windows XP operating system file, but he was not certain.  Trudy did further research and testified that the file appears to be part of an IBM ThinkPad file that they both had on their laptops when they were with L-3.  They deny using that file.

Dennis  testified that RAACI purchased file "PTACC.H"  for the third shipset of the FRV.  The file is the "extensibility took kit," a software package by Wonderware. that the RAACI was required to provide for FRV 3.

File "SQL.DEF" represents In-Touch software by Wonderware, which Dennis testified RAACI purchased.

---

[7]     The KILO MOANA took this action because L-3 went aboard the first FRV and removed the software from the hard drive because of its position that the software was not a deliverable to the customer.  Hardwick testified that it was his understanding that the source code for the first FRV was removed because it had been delivered without L-3's approval.

Dennis also reviewed plaintiff's exhibit 85, "Non-source Code Summary from All ES Numbers (minus ES12b) Deduped."  Dennis stated that "tms_i.ttf:" is a true type font file created by C-Map (mapping system for ships).   RAACI obtained C-Map, which is a commercial off-the-shelf software, because it was bidding on a job where C-Map software would be provided.  It was obtained as a "demo" from C-Map, not from the backup hard drive.  All succeeding files at the top half of the page through "nav.nav" were provided by C-Map.

File "00014894.doc" represents a sequence number that EDI used to designate files. Dennis testified that this file was obtained from Halter Marine in accordance with the FRV project for shipset 3.  In the file is a letter from Earl Windom, a former executive vice-president of EDI,[8] in connection with the first FRV shipset.  RAACI received a copy of the letter from Halter Marine because Halter Marine wanted Dennis to know exactly which schematics he needed to submit for the third FRV shipset.

"MCPARM2.000" and "PRECONFIG.EXE" were provided to RAACI by Inmass to demonstrate their inventory control software for providing parts to customers.  RAACI did not select Inmass as its inventory system.

"EXCEL.WRI" through "BARCODE.WRI" are software packages that RAACI purchased from OmniServer.  The software was not created by L-3 or RAACI.

File "daulcomj.cpp TEST CODE" is an AGOR source code file that RAACI obtained from the KILO MOANA.  RAACI added "test code" to the end.  The remaining files through

---

[8]    In 1990, Alvin Rankin and Earl Windom each owned one-third of the shares of EDI. Rankin sold his shares to Windom and Emile, and they each owned 50% of the company. Windom left SPD at the same time as Emile in September 2003.

"1_332.bmp" are AGOR files  provided by the KILO MOANA.

File "PTACC.LIB" was purchased by RAACI from Wonderware.  The file is the extensibility toolkit, a software package by Wonderware. that the RAACI was required to provide for the third shipset of the FRV.

Accordingly, the evidence shows that the universe of source code in exhibits 84 and 85, in which L-3 claims a trade secret is limited to the AGOR MCS, source code which Trudy and Dennis obtained from the KILO MOANA.  The question becomes whether the AGOR MCS source code obtained from the vessel is a trade secret that the defendants misappropriated.

### b.  AGOR MCS, DPS, and VMS

The AGOR-MCS was developed as part of a contract with Atlantic Marine in 2000 in the development of the AGOR 26, KILO MOANA, an oceanographic research vessel to be operated by the University of Hawaii.  Atlantic Marine was the primary contractor and purchaser, and EDI was the sub-contractor and seller.

Trudy testified that she got the AGOR source code from the machinery control computer on the KILO MOANA where it is stored.  L-3 contends that Atlantic Marine did not purchase the source code or computer programs from EDI, and EDI did not commit to deliver source code to Atlantic Marine.

Paragraph 15 of  EDI's contract with Atlantic Marine, entitled "Material Purchasing Terms & Conditions," provides:

15.  NONDISCLOSURE AND OWNERSHIP:  Ownership of, and all rights with respect to any goods purchased under this contract, including all creative ideas incorporated therein, all preliminary materials, sketches, layouts, tooling, molds,

14

dies, negatives, photographs, designs, blueprints or specifications relating thereto shall be vested exclusively in Purchaser's company.  Purchaser may copy or reproduce any and all goods purchased hereunder for any and all purposes and may use the same in any and all media as often as it may so desire.

All plans, drawings, designs and specifications supplied by Purchaser to Seller shall remain the property of Purchaser, and any information derived therefrom or otherwise communicated to the Seller, shall be regarded by him as strictly confidential and shall not without the prior written consent of Purchaser be disclosed to any third party.

Seller shall, upon Purchaser's request, promptly return all property, drawings, specification or like material to Purchaser.

Seller agrees to and does hereby grant to Purchaser, to the full extent of Seller's rights to do so without the payment of compensation to others, the right to reproduce, use and disclose for Governmental or other purposes all or any part of the reports, blueprints, drawings, data and technical information specified to be delivered by Seller to Purchaser under this contract, provided however, that nothing contained in this clause shall be deemed directly or by implication, to grant any license under any patent now or hereafter issued.

This Clause shall expressly survive termination or expiration of this Agreement.

Plaintiff's exh. 16, vol. 1.

The language of  EDI's contract with Atlantic Marine indicates that EDI transferred its rights to Atlantic Marine.  Paragraph 15 includes the right to reproduce, use, and disclose the delivered information for governmental purposes.  Emile and Windom testified that they negotiated the contract with Atlantic Marine, and it was their understanding that full rights for all of the design were transferred to Atlantic Marine.  Although Hardwick holds a different opinion, Hardwick does not have personal knowledge of whether the source code was delivered.  Accordingly, L-3 has not shown that there is a substantial likelihood that it will prevail on the merits of its claim that the AGOR MCS source code that appears on the deduped list is a trade

15

secret that the defendants have misappropriated.

Further, the evidence does not show that there is a likelihood of success on a claim that the AGOR 26 DPS (dynamic positioning system) or VMS (voyage management system) were misappropriated. Trudy worked on the bridge software for AGOR 26 DPS interface. Originally, Lockheed Martin provided the DPS, and Trudy took the C-Map "off the shelf" software, which was purchased for $15,000, and added an interface between Lockheed's DPS and the machinery control system which was written by Dennis. The Lockheed system did not work, and the ship replaced it with a Simrad system.

Moreover, Trudy testified that they do not have the source code for the VMS (voyage management system) for AGOR. RAACI went to the KILO MOANA to support Simrad, but could not support any source code changes.

c. **FRV MCS**

L-3 contends that the defendants misappropriated trade secrets for the FRV class of vessels. The defendants contend that 1) the FRV source code is not a trade secret, and 2) the source code for the FRV 3 differs from the first two vessels and was written from scratch.

The National Oceanic and Atmospheric Administration awarded the contract for the FRV class to Halter Marine in June 2000. Halter Marine subcontracted portions of the work to Hill Graham Controls, which subcontracted with EDI for the machinery control system. Trudy testified that Dennis used the AGOR MCS source code to create the original FRV source code.

Windom stated that EDI delivered the source code for the FRV 1 and 2. Windom testified that he negotiated the contracts for FRV 1 and 2, and if the source code had not been

16

required, EDI would not have delivered it.

The government awarded Halter Marine the contract to build  FRV 3 and 4.  RAACI's contract on the FRV 3 and 4 is with TECO-Westinghouse, who contracted with Halter.  Halter gave RAACI the password to access the "Description of Operation Control and Monitoring System" for the FRV.

Trudy testified that RAACI's original proposal was a completely new design different in appearance from FRV 1 and 2.  RAACI had to submit an alternate proposal because the FRV 3 and 4 had to have the same interface as the FRV 1 and 2 and mimic the same look and feel. Trudy and Dennis took pictures of the entire system to insure that all of the FRV vessels had the same interface.

Trudy testified that the source code of FRV 3 and 4 is also very different from FRV 1 and 2.  Trudy testified that she wrote the description of the FRV 3 and 4 from scratch from their collective knowledge and from flow diagrams and system doc diagrams that they developed. Trudy stated that she did not use any of L-3 source code, including AGOR source code which they received from the KILO MOANA, to write the software for FRV 3.  She wrote 100% of the FRV source code from scratch, beginning in February 2006 after RAACI obtained the contract. Trudy was excited about writing new source code because the older L-3 source code was written when they were much younger, and she was able to write new source code, applying all her experience and eliminating any problems.  Discussions are ongoing concerning replacing the source code on the FRV 1 and 2 with the new source code she has written.

Trudy disputes Hardwick's assertion that she could not have submitted a bid without

17

using L-3's source code. Trudy testified that she wrote the source code after she put together the proposal and won the bid for the job.  Trudy explained that one does not write the software for the proposal and the conceptual design.  She starts with the system engineering and mechanical engineering, submits some drawings, and then starts to write the software.   Trudy testified that they and L-3 bid on jobs all of the time without having source code for the job and that they both routinely develop the source code after the job is awarded.

In view of the evidence presented at the hearing, the court concludes that L-3 has not shown that it is likely to succeed on the merits of its claim that the FRV source code is a trade secret that the defendants have misappropriated.

### d.  T-AGOS, T-AKR300 (BOB HOPE CLASS SEALIFT), LSD47

The deduped list did not include the T-Agos, the T-AKR 300, and the LSD 47, and L-3 has not presented evidence that trade secrets for these classes of vessels are involved or that the defendants possess those trade secrets.  Based on the evidence presented, the court concludes that L-3 has not shown that it is likely to succeed on the merits of its claim that the defendants misappropriated trade secrets concerning the T-Agos, the T-AKR 300, and the LSD 47.

### e. Quality assurance manual and confidential information

The defendants agree that Dennis helped Emile with the Quality Assurance Manuals (QA) for an arc fault project, for which Brandywood submitted a bid.  Emile apologized for that action, stating that he did not think properly or act wisely.  He knew the content of the document because he wrote most of it.  Emile stated that he should have purchased the template on the web for $350 instead of precipitating these proceedings.  Emile admitted that there were other

18

documents that he changed to a Brandywood version.

Windom testified that the QA Manuals were not proprietary because they are written to "parrot back" the requirements of specifications for the project.  QA Manuals are generally not original works, but are tailored around QA Manuals that other companies have used.  Windom stated that L-3's QA Manual was similar to the one used by Boeing because the employees at TANO were former Boeing employees that got laid off from the space Program.  Windom added that EDI often gave copies of QA Manuals to suppliers to help them generate their own and assisted by reviewing QA plans before they were submitted.  Windom testified that they did not consider the data particularly sensitive, even though it carried a proprietary sticker.

The court finds that L-3 has not show that irreparable injury will result if a preliminary injunction is not issued on this claim.  Any injury which is proved to have resulted from the use of manuals or other documents can be compensated through monetary remedies.

### c. LUTPA

The defendants contend that, while L-3 may seek redress in a private action for alleged unfair practices, it does not have standing to seek an injunction based on LUTPA.  They argue that, although L-3 may seek damages under LUTPA, only the State, through the Attorney General, may seek injunction relief under La. Rev. Stat. 51:1407 for unlawful trade practices.

La. Rev. Stat. 51:1407 provides:

**Restraining prohibited acts.**  Whenever the director and the attorney general have reason to believe that any person is using, has used, or is about to use any method, act, or practice declared by R.S. 51:1405 to be unlawful, the director [of consumer affairs] may instruct the attorney general to bring an action for injunctive relief in the name of the state against such person to restrain and enjoin

the use of such method, act, or practice.

The Louisiana Court of Appeal for the First, Second, Fourth, and Fifth Circuits have concluded that "the clear wording of LSA-R.S. 51:1407 imbues the State through the Attorney General with the authority to seek injunctive relief pursuant to this statute," and plaintiffs lack "the legal capacity to seek injunctive relief to prohibit alleged unfair trade practices by defendants." Family Res. Group v. La. Parent Magazine, 818 So.2d 28, 33 (La.Ct.App. 2001).

Accordingly, L-3 lacks standing to seek injunctive relief under LUTPA.

**B.  Defendants' counterclaim under LUTPA**

The defendants filed a counterclaim under LUTPA , La. Rev. Stat. 1409(A), for attorney's fees and costs.  L-3 filed a motion to dismiss the counterclaim for failure to state a claim upon which relief can be granted, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.[9]

Rule 12(b)(6) authorizes a court to dismiss a claim on the basis of a dispositive issue of law."  Neitzke v. Williams,  109 S.Ct. 1827, 1832 (1989).  The complaint is liberally construed in favor of the plaintiff, and all facts pleaded in the complaint are taken as true.  See Campbell v. Wells Fargo Bank, 781 F.2d 440, 442 (5th Cir. 1986).  This Court does not dismiss a complaint under Rule 12(b)(6) "unless it appears beyond doubt that the plaintiff can prove no set of facts in

---

[9]    L-3 contends that the Noerr-Pennington doctrine  shields persons from liability under the Sherman Act for "exercising their rights that the First Amendment guarantees."  "The Noerr-Pennington doctrine confers immunity to private individuals seeking anticompetitive action from the government."  Bayou Fleet, Inc. v. Alexander, 234 F.3d 852, 859 (5th Cir. 2000).  Noerr-Pennington is inapplicable because government entities are not involved.  See Astoria Entertainment, Inc. v. Edwards, 159 F.Supp.2d 303, 323 (E.D.La. 2001).

support of his claim which would entitle him to relief." <u>Conley v. Gibson</u>,  78 S.Ct. 99, 101-02 (1957).

The defendants assert a claim for relief only for attorney's fees and costs under the portion of La. Rev. Stat. 51:1409A, which provides:

> Upon a finding by the court that an action under this section was groundless and brought in bad faith or for purpose of harassment, the court may award to the defendant reasonable attorney's fees and costs.

By asserting the claim, the defendants are preserving their right to seek attorney's fees and costs in the event that L-3's action under LUTPA is found to have been groundless and brought in bad faith or for the purpose of harassment.  Accordingly, L-3's motion to dismiss is denied.

### III. CONCLUSION

L-3's motion for a preliminary injunction is denied.  L-3 has not carried the burden of persuasion on all four requirements for a preliminary injunction on its claims under the Trade Secrets Act or CFAA.

Further, L-3's motion for injunctive relief under LUTPA is denied.  A private right of action for injunctive relief is not available under LUTPA.

L-3's motion to dismiss the defendant's counterclaim, pursuant to Rule 12(b)(6), is denied.

New Orleans, Louisiana, this   8th   day of March, 2007.

**MARY ANN VIAL LEMMON**
**UNITED STATES DISTRICT JUDGE**

21