UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA


L-3 COMMUNICATIONS WESTWOOD                    CIVIL ACTION
CORPORATION


VERSUS                                         NO: 06-279


ROBICHAUX ET AL.                               SECTION: "R"(1)



**ORDER AND REASONS**

Before the Court is defendants' motion for partial summary judgment and plaintiff's motion to dismiss without prejudice defendants' motion for partial summary judgment pursuant to Rule 56(f) of the Federal Rules of Civil Procedure.  For the following reasons, the Court GRANTS IN PART and DENIES IN PART plaintiff's motion to dismiss and GRANTS IN PART and DENIES IN PART defendants' motion for partial summary judgment.


**I.   BACKGROUND**

L-3 Communications Westwood Corporation (L-3) sued Joseph Emile Robichaux, Jr. (Emile Robichaux), Brandywood Corporation, Dennis Emile Robichaux, Trudy Barbe' Robichaux, and Robichaux Automation and Control, Incorporated (RAACI) on January 25, 2006. Plaintiff designs, develops, and sells automated control systems for the maritime and shipbuilding industries. (Compl. ¶ 12).  L-3 operates through a number of divisions, including its TANO-EDI

Division. (*Id*. ¶ 11).  TANO-EDI supplies the infrastructure, computer hardware and software that shipbuilders or outfitters install on large vessels, such as electrical, water purification, and damage control systems, as well as systems to help pilot and navigate the vessels. (*Id.*).

Defendants are former employees of L-3 and its predecessor companies.  Emile Robichaux is the father of Dennis Robichaux, who is the spouse of Trudy Robichaux.  Their relationship with the plaintiff began in May of 2000 when one of L-3's corporate affiliates, SPD Electrical Systems, Inc. (SPD), purchased Electronic Design, Inc. (EDI), which was principally owned by Emile Robichaux. (Compl. ¶ 14).  Emile Robichaux and SPD entered into an employment agreement, pursuant to which he became the President of the EDI Division of SPD. (*Id*. ¶ 15).  The agreement contained a non-competition clause.

On the same day as SPD's acquisition of EDI, SPD hired Dennis and Trudy Robichaux, also in its EDI Division. (*Id*. ¶ 16). In September of 2003, Emile Robichaux's employment with SPD terminated.  A couple of months later, on December 31, 2003, SPD sold to L-3 its EDI division. (*Id*. ¶ 18).  Dennis and Trudy Robichaux remained employed by SPD and then its successor, L-3, until plaintiff fired them on January 27, 2005. (*Id.* ¶ 17).

Emile Robichaux formed his own company, Brandywood, which plaintiff alleges provided the same types of services and

products that L-3 provides. (Compl. ¶ 24).  Plaintiff alleges
that from May 25, 2003 until May 25, 2005, Brandywood competed
with L-3 in violation of Emile Robichaux's non-competition
agreement, and in breach of the fiduciary and contractual duties
he owed and owes to L-3. (*Id.* ¶ 24).  Specifically, Brandywood
attempted to obtain a Navy contract for an "arc fault system."
While Emile Robichaux was employed by EDI and SPD, neither entity
made any device like the arc fault. (R. Doc. 84-3 ¶¶ 10-11).
After he left SPD, however, L-3 entered into negotiations with
another company that produced arc fault systems, and as part of
the negotiations entered into an agreement not to compete
regarding the arc fault.  The parties dispute whether Emile
Robichaux was aware of those negotiations. (*Id.* ¶¶ 11-12).
Plaintiff further alleges that Dennis and/or Trudy Robichaux,
while still employed by L-3, provided Emile Robichaux with L-3's
internal, confidential and/or proprietary documents and
information for Brandywood's use, including a quality assurance
manual. (*Id.* ¶ 25-26).

    Around this same time period, L-3 began reviewing e-mail
traffic and computer files used by Dennis and Trudy Robichaux.
L-3 asked them to execute employment agreements that contained
non-competition clauses.  They failed to sign the agreements, and
L-3 terminated defendants' employment in January of 2005.  After
hiring a computer forensics firm, Stroz Friedberg, L.L.C., to

analyze the laptop computers Dennis and Trudy Robichaux used at work, L-3 discovered that in December of 2004, Dennis and Trudy Robichaux had backed up the entire contents of their laptops to an external hard drive. (R. Doc. 84-3 ¶¶ 21, 23-24).  Defendants do not dispute that they made a backup of the laptops, but they contend that they did so to support the work they did from home.

Plaintiff alleges that the files Dennis and Trudy Robichaux backed up included the Machinery Control Systems (MCS) software for vessels in six different classes, the Fisheries Research Vessel (FRV), Military Sealift Command - Fast Sealift (AKR), Auxiliary General Ocean Research (AGOR), Dock Landing Ship (LSD), and Auxiliary General Ocean Surveillance (AGOS) classes.  The files also allegedly included L-3's Dynamic Positioning Systems (DPS) software, Autopilot and Electronic Chart System (APECS) software, and Electronic Chart Systems (ECS) software.

In February of 2005, Dennis and Trudy Robichaux formed RAACI, which began to compete with L-3.  Although L-3 had contracted with the government to furnish the automated systems for the first and second ships of the Fisheries Research Vessels, RAACI bid to provide the systems for the third ship and won the contract. (Compl. ¶ 42).  The parties dispute whether the computer software that RAACI uses to compete with L-3 is the original work of RAACI, or whether defendants used software and files they copied from their L-3 laptops.

In June of 2005, L-3 sued the defendants in state court.[1]
In January of 2006, L-3 sued the same defendants in federal
court.  Plaintiff contends that defendants are liable to it for
their alleged violations of the Computer Fraud and Abuse Act
(CFAA), the Louisiana Uniform Trade Secrets Act (LUTSA), the
Louisiana Unfair Trade Practices and Consumer Protection Act
(LUTPA), for tortious interference in business relations, and for
breach of contract and breach of fiduciary duties.  L-3 sought a
temporary restraining order, a preliminary injunction, damages,
and permanent injunctive relief.  Defendants filed a counterclaim
under LUTPA.  L-3 moved for a preliminary injunction and filed a
motion to dismiss the defendants' counterclaim.

In February of 2006, after the current litigation began,
Trudy, Dennis, and Emile Robichaux made their current computers
and the RAACI computers available to L-3's counsel for imaging.
Stroz conducted a "hash value" analysis in nine different
categories requested by L-3, to determine if the files on the
laptops matched any files on the defendants' computers.[2] (R. Doc.
84-3 ¶ 36).  Stroz identified some matching files.  At the
hearing on L-3's application for a preliminary injunction,

---

[1] The state court case is apparently stayed pending the
outcome of this case. (Defs.' Opening, R. Doc. 56 at 12:1-2).

[2] A "hash value" is an electronic fingerprint.  In order for
two hash values to match, the files must be identical for every
character and every line.

defendants explained that they had purchased some of the matching files from third parties, and that the only source code Stroz found, that for the AGOR MCS, was given to them by the United States government.  After a three-day hearing on the motion for preliminary injunction, Judge Lemmon denied both the motion for preliminary injunction and the motion to dismiss the counterclaim. (R. Doc. 69).  After defendants filed the present motion for partial summary judgment, the case was transferred to this Court.

## II.   LEGAL STANDARD

Summary judgment is appropriate when there are no genuine issues as to any material facts, and the moving party is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986).  A court must be satisfied that no reasonable trier of fact could find for the nonmoving party or, in other words, "that the evidence favoring the nonmoving party is insufficient to enable a reasonable jury to return a verdict in her favor." *Lavespere v. Niagara Mach. & Tool Works, Inc.*, 910 F.2d 167, 178 (5th Cir. 1990) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).  The moving party bears the burden of establishing that there are no genuine issues of material fact.

If the dispositive issue is one on which the nonmoving party

will bear the burden of proof at trial, the moving party may
satisfy its burden by merely pointing out that the evidence in
the record contains insufficient proof concerning an essential
element of the nonmoving party's claim. *See Celotex*, 477 U.S. at
325; *see also Lavespere*, 910 F.2d at 178.   The burden then shifts
to the nonmoving party, who must, by submitting or referring to
evidence, set out specific facts showing that a genuine issue
exists. *See Celotex*, 477 U.S. at 324.   The nonmovant may not rest
upon the pleadings, but must identify specific facts that
establish a genuine issue exists for trial. *See id.* at 325;
*Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1996).


**III. DISCUSSION**

   **A.   Rule 56(f) Motion**

   Plaintiff contends that defendants' motion for partial
summary judgment is premature because the parties are still
engaged in discovery.   Plaintiff moves the Court, pursuant to
Rule 56(f) of the Federal Rules of Civil Procedure, to dismiss
defendants' motion as premature.

   Rule 56(f) provides in pertinent part:

   Should it appear from the affidavits of a party opposing
   the motion that the party cannot for reasons stated
   present by affidavit facts essential to justify the
   party's opposition, the court may refuse the application
   for judgment or may order a continuance to permit
   affidavits to be obtained or depositions to be taken or
   discovery to be had or may make such other order as is

just.

Fed. R. Civ. P. 56(f).  Rule 56(f) is designed to safeguard against a premature or improvident grant of summary judgment. *Washington v. Allstate Ins. Co.*, 901 F.2d 1281, 1285 (5th Cir. 1990) (citing 10A Wright, Miller, and Kane, *Federal Practice and Procedure* § 2740 (1983)).  To obtain a Rule 56(f) continuance, the nonmovant must present specific facts explaining its inability to make a substantive response as required by Rule 56(e) and by specifically demonstrating "how postponement of a ruling on the motion will enable him, by discovery or other means, to rebut the movant's showing of the absence of a genuine issue of fact." *Washington*, 901 F.2d at 1285 (quoting *Securities and Exchange Commission v. Spence & Green Chemical Co.*, 612 F.2d 896, 901 (5th Cir. 1980)).  The nonmovant may not simply rely on vague assertions that discovery will produce needed, but unspecified, facts. *Id.* (citing *Gossett v. Du-Ra-Kel Corp.*, 569 F.2d 869, 873 (5th Cir. 1978)).

The Court finds that plaintiff's motion to dismiss demonstrates "how the additional time will enable him to rebut the movant's allegations of no genuine issue of fact" for some of the causes of action of which defendants have moved for summary judgment. *Id.* at 1286 (quoting *Weir v. Anaconda Co.*, 773 F.2d 1073, 1083 (10th Cir. 1985)).  Plaintiff has introduced the affidavit of Bruce Schewe, counsel for L-3, that it is currently

8

pursuing facts germane to its claims.  Specifically, plaintiff's expert, Ronald Ledet, is still reviewing RAACI files to determine whether the programs, software, and/or the source code that RAACI uses is derived in whole or in part from the materials on L-3's laptop computers that Dennis and Trudy Robichaux copied. (Shewe Aff., R. Doc. 89-4 ¶ 14).  Plaintiff did not explain in the affidavit how pending discovery requests pertain to its ability to respond to the summary judgment motion. *See Wichita Falls Office Associates v. Banc One Corp.*, 978 F.2d 915, 919 (citing *International Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1268 (5th Cir. 1991) (in order to establish a continuance of discovery, a nonmovant must demonstrate "how the requested discovery pertains to the pending motion")).  Accordingly, the Court grants in part and denies in part plaintiff's Rule 56(f) motion.  To the extent Mr. Ledet's analysis could impact whether there is an issue of fact, the Court will deny summary judgment at this stage.  For those claims in which plaintiff's affidavit has no apparent relevance to the issues raised in the motion, the Court denies plaintiff's Rule 56(f) motion.

> **B.   Computer Fraud and Abuse Act**

In its opposition to defendants' motion for partial summary judgment, plaintiff withdrew its claims under the Computer Fraud and Abuse Act (CFAA). (Pl.'s Opp'n, R. Doc. 91-2 at 7). Plaintiff's CFAA claims are dismissed with prejudice.

**C.    LUTPA**

The Court finds that plaintiff has raised a genuine issue of fact as to whether defendants' actions constituted unfair or deceptive trade practices.  The Louisiana Unfair Trade Practices Act (LUTPA) declares unlawful "[u]nfair methods of competition and unfair or deceptive acts or practice in the conduct of any trade or commerce." La. Rev. Stat. § 51:1405; *see also Omnitech Intern., Inc. v. Clorox Co.*, 11 F.3d 1316, 1331 (5th Cir. 1994) ("The real thrust of the LUTPA ... is to deter injury to competition").  Courts determine what "unfair" and "deceptive" conduct is on a case by case basis. *American Machinery Movers, Inc. v. Machinery Movers of New Orleans, LLC*, 136 F. Supp. 2d 599, 604 (E.D. La. 2001); *Core v. Martin*, 543 So.2d 619, 621 (La. App. 1989).  Louisiana courts have described a practice as unfair "when the practice is unethical, oppressive, unscrupulous, or substantially injurious." *Jefferson v. Chevron U.S.A. Inc.*, 713 So. 2d 785, 792 (La. App. 1998); *Omnitech*, 11 F.3d at 1332.  A trade practice is deceptive when it amounts to "fraud, deceit or misrepresentation." *Jefferson*, 713 So. 2d at 793; *see also Computer Management Assistance Co. v. Robert F. DeCastro, Inc.*, 220 F.3d 396, 404 (5th Cir. 2000) ("To recover under LUTPA, a plaintiff must prove fraud, misrepresentation or other unethical conduct.").

Plaintiff has pointed to evidence of unethical conduct by the defendants, including the following: (1) Dennis Robichaux provided Emile Robichaux with L-3 documents after Emile Robichaux left EDI but while Dennis Robichaux was still employed at L-3 (Dennis Robichaux Test., R. Doc. 57 at 32, 65-67); (2) Emile Robichaux used his former employer's documents in conjunction with his new corporation, Brandywood (*id.*); (3) Dennis and Trudy Robichaux copied confidential files, software, and source code from their L-3 laptops, which they retained and examined after they were fired. (*See, e.g.,* Dennis Robichaux Test at 45; Trudy Robichaux Test., R. Doc. 58 at 26) (admitting that they examined the backup drive after they were fired).  Plaintiff's Rule 56(f) affidavit also indicates that it is still conducting discovery to determine whether Dennis and Trudy Robichaux used any of the files that they copied from their L-3 laptops to compete against L-3, in particular in connection with the contracts for the FRV-3 and FRV-4. (Schewe Aff. ¶ 21(a)).

Defendants point to their own testimony that they did not use L-3's confidential and/or proprietary information to compete against L-3 for the FRV-3 contract. (Trudy Robichaux Test. at 63:5-8) ("I wrote FRV source code myself 100 percent from scratch.").  Defendants do not contest, however, that they provided Emile Robichaux with L-3 documents while they were still employed by L-3 and that Emile Robichaux used those documents in

11

conjunction with his work for Brandywood. Further, Dennis and Trudy Robichaux admit that they copied the contents of their work-issued laptop computers, kept a backup drive of the files even after they were fired, and restored and looked at some of the files after they formed RAACI.

The Louisiana Second Circuit Court of Appeal has stated that "the misappropriation of confidential information, although not technically a trade secret ... may serve as a basis for relief" under LUTPA. *See Defcon, Inc. v. Webb*, 687 So. 2d 639, 643 (La. App. 1997). Further, the Fifth Circuit has noted that relief might be available under LUTPA when a former employee breaches his duty not to use his former employer's confidential information. *NCH Corp. v. Broyles*, 749 F.2d 247 (5th Cir. 1985) (remanding to district court to determine if additional relief was available under LUTPA). Accordingly, summary judgment is not appropriate. Plaintiff has introduced sufficient evidence to raise an issue of fact regarding whether defendants violated LUTPA. *See, e.g., Jefferson*, 713 So. 2d at 793 (holding that plaintiffs were entitled to a trial to determine whether defendant's actions were unfair or deceptive in violation of LUTPA, or "whether said actions [were] simply an exercise of justified business activities.").

**D. Misappropriation of Trade Secrets**

In order to recover damages under Louisiana's Uniform Trade

Secrets Act, a complainant must prove (1) the existence of a
trade secret; (2) the misappropriation of the trade secret by
another; and (3) actual loss caused by the misappropriation. *See*
La. Rev. Stat. § 51:1431; *Computer Management*, 220 F.3d at 403.
The Court finds that defendants did not misappropriate
plaintiff's trade secrets because plaintiff did not use efforts
reasonable under the circumstances to maintain the secrecy of its
alleged trade secrets in the source code and quality assurance
manuals at issue.[3]  Further, plaintiff has raised no issue of
material fact to refute defendants' evidence introduced in
support of summary judgment on this claim.

### 1.   Unlimited Rights

The Court finds that the government has "unlimited rights"
in the source code for the T-AGOS 23,[4] the T-AKR 300, Bob Hope

---

[3] Defendants also contend that certain "drawings" and "form,
fit, and function" matters are not trade secrets. (Defs.' Mot.
Sum. J., R. Doc. 84-2 at 27-28).  These items are not included in
plaintiff's complaint, and defendants have not provided
sufficient information regarding what they are to enable the
Court to render a summary judgment decision. *See Davidson v.
Stanadyne, Inc.*, 718 F.2d 1334, 1339 (5th Cir. 1983)(quoting
*Palmer v. Chamberlin*, 191 F.2d 532, 540 (5th Cir. 1951)) ("Where
... the decision of a question of law by the Court depends upon
an inquiry into the surrounding facts and circumstances, the
Court should refuse to grant a motion for a summary judgment
until the facts and circumstances have been sufficiently
developed to enable the Court to be reasonably certain that it is
making a correct determination of the question of law.").

[4] Defendants have stated in their summary judgment motion
that the T-AGOS 23 did not contain a full MCS system, but
contained only the autopilot, electronic chart system, and
steering system. (Windom Test., R. Doc. 57 at 118-119).  The

Class (Sealift) vessels, the LSD-47 (Rushmore), and the FRV 40,
ships 1 and 2 because all were produced entirely with government
funding.  The Defense Federal Acquisition Regulation Supplements
("DFARS") are key to understanding what rights the government
acquires pursuant to one of its defense contracts.  The
Department of Defense DFARS are located in 48 C.F.R., Chapter 2,
part 252, covering solicitation provisions and contract clauses.
These DFARS provide in relevant part:

> (b) Rights in computer software or computer software
> documentation.  The Contractor grants or shall obtain
> for the Government the following royalty free, world-
> wide, nonexclusive, irrevocable license rights in
> noncommercial computer software or computer software
> documentation.  All rights not granted to the
> Government are retained by the Contractor.
>
> (1) Unlimited rights.  The Government shall have
> unlimited rights in–
>
> (i) Computer software developed exclusively with
> Government funds;
>
> (ii) Computer software documentation required to be
> delivered under this contract ...

48 C.F.R. 252.227-7014(b)(1)(i)-(ii) ("Rights in noncommercial
computer software and noncommercial computer software
documentation").  The test for granting the government unlimited
rights is disjunctive.  The word "and" is not included between
(b)(1)(i) and (ii).  In fact, sub-parts (v) and (vi) of the

---

Court uses the term "source code" to refer generally to the
autopilot, electronic chart system, and the steering system for
the T-AGOS 23.

section on unlimited rights are separated by the word "or."[5]

Accordingly, the government has unlimited rights in computer software developed exclusively with government funds.  Computer software includes source code. *See* DFAR 252.227-7014(a)(4) ("Computer software means computer programs, source code ..."); *see also Williams Intern. Corp. v. Lehman*, 1984 WL 3227, *8 (D.D.C., 1984) (finding that if a government contractor wants to maintain data as a trade secret through the use of restrictive markings, "it is in the contractor's best interest to maintain

---

[5] Section (b)(1) provides in full that the Government shall have unlimited rights in:
(i) Computer software developed exclusively with Government funds;
(ii) Computer software documentation required to be delivered under this contract;
(iii) Corrections or changes to computer software or computer software documentation furnished to the Contractor by the Government;
(iv) Computer software or computer software documentation that is otherwise publicly available or has been released or disclosed by the Contractor or subcontractor without restriction on further use, release or disclosure, other than a release or disclosure resulting from the sale, transfer, or other assignment of interest in the software to another party or the sale or transfer of some or all of a business entity or its assets to another party;
(v) Computer software or computer software documentation obtained with unlimited rights under another Government contract or as a result of negotiations; or
(vi) Computer software or computer software documentation furnished to the Government, under this or any other Government contract or subcontract thereunder with-
(A) Restricted rights in technical data, or government purpose license rights and the restrictive conditions have expired; or
(B) Government purpose rights and the Contractor's exclusive right to use such software or documentation for commercial purposes has expired.

records to show that the contractor fully paid for the development of that data in order to justify the use of the restrictive legends.").

Defendants have pointed to evidence that all of the source codes at issue, except for the source code for the LSD-47, were developed exclusively with government funding. (*See* Windom Test. at 119:11-14 (autopilot and steering systems for the bridge for the T-AGOS funded by the government), 120:9-11 (MCS for the Sealift developed with government funding); Emile Robichaux Test. at 130-131 (EDI first created the MCS software for the FRV 40 in the performance of the contract, without any prior research and development budget)).

The LSD-47 (Rushmore) was built for the Navy.  EDI developed the software for the Rushmore.  Because of some disputes regarding the source of the funding for the development of the software, in 1998 the government and EDI entered into a contract pursuant to which the government obtained government purpose rights for the first five years of the contract, after which time the government obtained unlimited rights. (Windom Test. at 122:17 - 123:8-16); *see also* 48 C.F.R. 252.227-7014(b)(2)(ii) (providing that unless otherwise negotiated, government purpose rights remain in effect for five years after which time the government has unlimited rights in the computer software or computer software documentation).  The government has had unlimited rights

16

to the source code for the Rushmore since approximately 2003.
(Windom Test. at 123).

Plaintiff has pointed to no evidence in its opposition to
summary judgment that creates a genuine issue of fact regarding
the funding of the source codes.  Assertions and arguments are
not evidence.  Similarly, although plaintiff repeatedly avers
that defendants are selectively quoting from contract language
and DFARs, it has pointed to no additional or contradictory
contract language or regulations that would create a genuine
issue of fact.  The only issue plaintiff has raised is whether
the source codes were ever "delivered."  The DFARS cited by the
parties do not define delivery or specify it as a condition
precedent to the government's obtaining unlimited rights when the
government has funded the development of computer software.

Further, two of the contracts for the source codes at issue,
those for the Sealift and the LSD-47, specifically listed the
source code as a deliverable. (*See* "Contract Data Requirements
List for Sealift" R. Doc. 84-25 at 6; *see also* R. Doc. 84-12 at 1
(letter from Windom to Avondale enclosing nine copies of the
source code)).  As with the source code for the Sealift vessels,
the source code for the LSD-47 was listed as a specific
deliverable item in EDI's contract with the Navy. (*See* "LSD-47
Contract," R. Doc. 84-12 at 4) (listing "Source code for
Machinery Control System (MCS) software developed with Wonder

17

Ware" as a "CDRL 005").[6]   The government's decision to explicitly include source code as a deliverable under these two contracts does not alter the fact that the regulations grant the government unlimited rights in all computer software developed exclusively with Government funds, without requiring that it be listed as a "deliverable" under the contract.

Accordingly, the Court finds that the government has unlimited rights to the source codes for the Sealift vessels, the LSD-47, the T-AGOS 23 and the FRV 40, ships 1 and 2.[7]   Unlimited rights include "rights to use, modify, reproduce, release, perform, display, or disclose computer software or computer

---

[6] CDRL is an acronym for Contract Data Requirements List. *See, e.g., Avtel Services, Inc. v. U.S.*, 70 Fed. Cl. 173 (Fed. Cl. 2006); (*see also* Windom Test. at 121:6-7) (defining CDRL as "a contract deliverable item, contract data item.").

[7] When the U.S. government obtains unlimited rights to a deliverable, the contract does not divest the contractor of ownership of the source code.   Rather, the contract provides the government a nonexclusive license.   Even counsel for defendants stated at the preliminary injunction hearing, "You may own it, but you've given unlimited rights ... to the Government to use it on their ships." (Defs.'s Opening at 14:15-17).   Additionally, the Office of the Undersecretary of Defense for Acquisition Technology and Logistics produces a guide for negotiating intellectual property contracts which provides that "Contractors are generally permitted to retain ownership (*e.g.*, title) of the IP rights governing the technologies/information that they develop or deliver under DoD contracts; and DOD receives only a (nonexclusive) license to use that IP—the scope of the license depends on the nature of the data, the relative source of funding for development, and negotiation between the parties." *See* Office of Acquisition Initiatives, Under Secretary of Defense, *Intellectual Property: Navigating Through Commercial Waters*, 2-2 (Ver. 1.1., Oct. 15, 2001).

software documentation in whole or in part, in any manner and for any purpose whatsoever, and to have or authorize others to do so." *See* DFAR 252.227-7014(a)(15).

### 2.    Trade Secrets

The Court finds that because plaintiff provided the government with unlimited rights to all of the source codes at issue, they are no longer trade secrets.  The Court also finds that the Quality Assurance Manuals (QA Manuals) at issue are not trade secrets.  LUTSA defines a trade secret as:

> [I]nformation, including a formula, pattern, compilation, program, device, method, technique, or process, that: (a) derives independent economic value, actual or potential, from not being generally known to and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use, and (b) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

La. Rev. Stat. § 51:1431(4).  The test is conjunctive, the Court must find that information has both independent economic value and that plaintiff used reasonable efforts to maintain its secrecy to find that the information constitutes a trade secret.

### a.    Source Codes

No party appears to dispute that the source codes derive independent economic value from not being generally known or readily ascertainable.  At issue is whether the source codes were the subject of efforts, reasonable under the circumstances, to maintain their secrecy.  The Court finds that as a matter of law,

19

they were not.  Granting the government unlimited rights to data
without any restrictive legend or markings constitutes a failure
to maintain secrecy.

In *Secure Services Technology, Inc. v. Time and Space
Processing Inc.*, 772 F. Supp. 1354 (E.D. Va. 1989), the parties
manufactured and sold facsimile machines to the U.S. government.[8]
The U.S. government loaned one of the competitors the machine of
the other competitor so that it could improve the
interoperability of the machines.  Plaintiff sued the competitor
contending that the protocol variations of its fax machines were
trade secrets.  The Court held that it was "plain beyond dispute"
that the protocol variations were not the subject of efforts
reasonable under the circumstances to maintain their secrecy.
The government had purchased all rights, title, and interest in
the machine, plaintiff had given no notification that the machine
included proprietary information, and plaintiff had not included
any restrictive or proprietary legends with the machines.  The
Court therefore held that plaintiff had granted the government
unlimited rights in the machines, thereby waiving its trade
secret protection. *Id.* at 1359-62 ("the Court concludes that even
assuming the protocol variations are protectable proprietary
information, [plaintiff's] failure to take the necessary, minimal

---

[8] The case was decided pursuant to California's provisions
of the Uniform Trade Secrets Act, which define a trade secret in
the same way as LUTSA.

precautions to safeguard this information when it sold the ... machines to the government renders the information ineligible for trade secret protection"). *See also Night Vision Corp. v. U.S.*, 68 Fed. Cl. 368 (Fed. Cl. 2005) (holding that contractor waived any legal protection from disclosure of data rights when it delivered prototypes to the government without marking the prototypes or their packaging with appropriate proprietary data legends); *Conax Florida Corp. v. U.S.*, 824 F.2d 1124 ("if the drawings belong to the government without limitation, [plaintiff] has no trade secrets to be protected"); *Sheets v. Yamaha Motors Corp., U.S.A.*, 849 F.2d 179 (5th Cir. 1988) (holding that inventor waived LUTSA claims by failing to maintain secrecy of his invention).

The DFARS contemplate a way for contractors to protect their trade secrets, and plaintiff did not take advantage of any of those protections. *See* DFAR 252.227-7013(e)(2) (requiring contractors to disclose in an attachment to a contract any technical data that is "furnished to the Government with restrictions on use, release, or disclosure"); (*see also* Windom Test. at 123) (discussing EDI contract that provided government purpose rights, not unlimited rights).

Even if the government's unlimited rights do not *ipso facto* eliminate trade secret protection in the source codes that the government acquired, there is no evidence that plaintiff took any

21

steps to protect the information.  Defendants point to evidence that no legends were placed on any of the source codes except for that of the Rushmore. (Windom Test. at 143, 195; Dennis Robichaux Test. at 111; PI Exhs. T-61 – T-68 (photos of FRV MCS)).[9] Plaintiff simply has not come forward with any record evidence showing some reasonable efforts to maintain secrecy or otherwise protect the data.  Therefore no issue of fact exists to dispute defendants' evidence that L-3 did not use reasonable efforts to maintain the secrecy of its source code.

### b.   QA Manuals

Defendants have introduced evidence that L-3 did not employ efforts reasonable under the circumstances to maintain the secrecy of its QA Manuals.[10]  For example, Earl Windom, former Vice President of EDI, testified that he does not think QA Manuals are proprietary and that EDI often gave copies of its QA Manuals to its suppliers to help them generate their own, so as to ensure that EDI could buy parts from the suppliers that would be of the right quality for EDI's contracts. (Windom Test. at

---

[9] Defendants contend that even though the original Rushmore contract included restricted rights for the computer databases and software, those rights were extinguished when the contract converted from government rights to unlimited rights in 2003. Plaintiff has not disputed this contention.

[10] Windom testified that QA Manuals define the procedure that a company will use in order to ensure that the products that it manufactures meet the quality standards of the organization it contracts with. (Windom Test. at 131).

133). He further testified that EDI would review its suppliers'
QA plans before they submitted them for approval. (*Id.* at 132-
33). Plaintiff has not pointed to any evidence that L-3 employed
efforts to maintain the secrecy of the QA Manuals. Accordingly,
the Court finds that the QA Manuals are not trade secrets. *See*
La. Rev. Stat. § 51:1431(4); *see also Sheets v. Yamaha Motors
Corp.*, 849 F.2d 179, 183-84 (5th Cir. 1988) ("A disclosure of a
trade secret to others who have no obligation of confidentiality
extinguishes the property right in the trade secret.").

### 3.   Ownership

The Court finds that defendants did not misappropriate the
AGOR MCS source code because it is not a trade secret, and it was
not misappropriated in any event. AGOR, which stands for
auxiliary general ocean research, is a U.S. Government ship
program. EDI entered into a contract with Atlantic Marine, a
shipyard, to provide products for one of the AGOR ships, the AGOR
26. (Hardwick Test., R. Doc. 56 at 47:6-13). The AGOR MCS was
developed in 2000 as part of EDI's contract with Atlantic Marine.
Atlantic Marine was the primary contractor for the government and
hired EDI as a sub-contractor. The EDI contract with Atlantic
Marine provides:

> Ownership of, and all rights with respect to any goods
> purchased under this contract, including all creative
> ideas incorporated therein, all preliminary materials,
> sketches, layouts, tooling, molds, dies, negatives,
> photographs, designs, blueprints or specifications

23

> relating thereto shall be vested exclusively in
> Purchaser's company.
> ...
> Seller agrees to and does hereby grant to Purchaser, to
> the full extent of Seller's rights to do so without the
> payment of compensation to others, the right to
> reproduce, use and disclose for Governmental or other
> purposes all or any part of the reports, blueprints,
> drawings, data and technical information specified to be
> delivered by Seller to Purchaser under this contract.

(R. Doc. 84-12 at 8-9).  Emile Robichaux and Earl Windom, the two

parties who negotiated the contract on behalf of EDI, also

testified that pursuant to the contract they sold the MCS source

code to Atlantic Marine. (*See, e.g.,* Windom Test. at 166:21-23)

("It says that the ownership of all rights, with respect to goods

purchased under this contract are the property of the end user,

which is the owner of the vessel.").

Defendants also did not misappropriate any L-3 trade secret

in the AGOR source code because the government, which has the

right to reproduce, use, and disclose the AGOR source code,

provided it to RAACI.  After Trudy and Dennis Robichaux formed

RAACI, they were hired to do work on the KILO MOANA, and they

retrieved the AGOR source code from the machinery control

computer of the ship to complete their work. (*See* Dennis

Robichaux Test. at 8-12).  The government also asked them to take

the source code and install it on RAACI's computers so that the

government would not have to fly Dennis or Trudy Robichaux to the

ship every time the government needed work done.  The government

provided Trudy and Dennis Robichaux access to the source code for

24

which it had purchased ownership rights. (*Id.*)

Finally, even if L-3 still claims an ownership right in the AGOR MCS, it did not introduce any evidence that it preserved it from disclosure by the government through the use of restrictive legends, markings, or attachments to the contract. *See Secure Services, supra; Night Vision Corp., supra;* DFAR 252.227-7013(e)(2).

**E.   Breach of Contract**

Defendants move for summary judgment on plaintiff's claim that Emile Robichaux breached his employment agreement with L-3. Defendants contend that Emile Robichaux did not breach the agreement because he did not violate the non-competition provision when his company, Brandywood, bid on an arc fault system contract with the U.S. Navy during the time frame in which the non-competition provision was still in effect.  The non-competition section of the employment agreement restricts Emile Robichaux's ability to compete with respect to certain products and services:

> During the Non-Competition Period, the Employee will not, and will cause his affiliates not to, directly or indirectly, design, manufacture, market or sell products or provide services which are competitive to those products manufactured and sold by the Company at the time of the Closing (as defined in the Purchase Agreement) or those services provided by the Company at the time of the Closing to its customers or improvements or extensions of such products or services ("Competitive Products and Services").

(Employment Agreement at 8).  The employment agreement is dated

25

May 25, 2000, and barred Emile Robichaux from competing with SPD, a corporate affiliate of L-3, until the "second anniversary of the expiration of the Employment term." (*See id*.).  Plaintiff contends that Emile Robichaux's employment term ended in September of 2003.  Although defendants aver that Emile Robichaux only worked at SPD until May of 2003, Emile Robichaux's own testimony indicates that he worked at EDI until it was purchased by SPD in May of 2000, and then he continued working for SPD until September of 2003. (Emile Robichaux Test. at 176:16-18).[11] The Court finds that defendants' own evidence shows that Emile Robichaux worked for SPD until September of 2003.  Accordingly, his non-competition agreement with SPD terminated two years later, in September of 2005.

Plaintiff does not dispute Emile Robichaux's testimony that at the time he worked for SPD, SPD did not engage in arc fault work. (Emile Robichaux Test. at 181:24 - 182:1).  Plaintiff contends, however, that at the time Brandywood bid on the arc fault system with the Navy, L-3 was negotiating to purchase a company that manufactured arc fault systems, and therefore Brandywood was directly competing with L-3. (R. Doc. 91-2 at 17). Plaintiff further avers that Emile Robichaux was aware of L-3's negotiations, based on an e-mail Emile Robichaux sent to Dennis

---

[11] Additionally, in its motion for partial summary judgment, defendants stated that Emile Robichaux's employment with SPD terminated in September 2003. (Defs.' Mot. Sum. J. at 4).

and Trudy Robichaux attaching a story about a company's rejection of L-3's offer to acquire it.  The e-mail reads "We dodged one here."[12]  This is the only evidence plaintiff has introduced in support of its breach of contract claim.

Plaintiff has conceded that it did not manufacture an arc fault system while Emile Robichaux was employed at SPD.  The Court therefore finds that when Brandywood bid on the Navy contract, it was not bidding on a contract to design, manufacture, market or sell a product or provide a service which was competitive with a product manufactured and sold by L-3 at the time of the Closing or any extension or modification of an already existing product or service. (*See* Employment Agreement at 8).  Emile Robichaux was restricted only from working on products or services L-3 manufactured or produced as of the Closing date or any extension or modification of an already existing product or service.  Further, plaintiff never acquired the company that manufactured arc fault systems, therefore regardless of whether Emile Robichaux knew L-3 was negotiating with another company, he was never violating the terms of his non-competition agreement. Accordingly, the Court finds that plaintiff has proffered no evidence that Emile Robichaux breached his employment agreement. Therefore, defendants are entitled to summary judgment on this

---

[12] The e-mail is contained in Exhibit T-48 of the preliminary injunction hearing, bates no. L-3 015687-689.

claim.

**F.   Breach of Fiduciary Duties**

The Court grants defendants summary judgment on plaintiff's claim that Emile Robichaux breached a fiduciary duty to L-3, but denies defendants summary judgment on plaintiff's breach of fiduciary duty claims with respect to Dennis and Trudy Robichaux. The Fifth Circuit has stated that "an agent has a duty not to use or communicate information given to him in confidence in competition with or to the injury of the principal unless the information is a matter of general knowledge." *NCH Corp.*, 749 F.2d at 254.  There is evidence to create an issue of fact as to whether Dennis and Trudy Robichaux breached their fiduciary duties owed to their former employer.  Both Dennis and Trudy Robichaux copied the entire contents of their company-issued laptops and kept the backup of their laptops after L-3 fired them.  Copying the contents of the laptops alone may be sufficient evidence of a breach of fiduciary duty.  There is disputed testimony in the record regarding whether Dennis and Trudy Robichaux violated company policy when they backed up their laptops.  Hardwick, L-3's representative, testified that employees were permitted only to back up computers to L-3's server, not to external hard drives.[13]  Further, both Trudy and

---

[13] He also testified on cross-examination, however, that he was not aware of any written policy prohibiting employees from backing up their computers. (Hardwick Test. at 90:22 - 91:6).

Dennis Robichaux testified that they accessed the backup more than once after they were fired, although both testified that they did so because of litigation threats, not to use the data to compete against L-3. Finally, Dennis Robichaux testified that they looked at the backup to determine if they had the low level source code for the Sealift vessels, thus creating an inference that they might have used L-3's confidential files in competition with it. (Dennis Robichaux Test. at 45:22-25). This is sufficient evidence raising genuine issues of material fact regarding the defendants' alleged breach of fiduciary duties to survive a motion for summary judgment.

The Court finds, however, that Emile Robichaux did not breach any fiduciary duty owed to L-3 because there is no evidence that he misused its confidential and/or proprietary information while he worked for the company. There is only evidence that he received documents after he left EDI. *See, e.g., Frederic v. KBK Financial, Inc.*, 2001 WL 30204, *4 (E.D. La. 2001) ("the question of whether a former employee breached a fiduciary duty to his former employer ... primarily turns on whether the [breach] occurred prior to or subsequent to the termination of the employment relationship"). Plaintiff has introduced no evidence of a fiduciary relationship between Emile Robichaux and L-3 after Emile Robichaux's employment with SPD terminated. "To sustain a cause of action for breach of

fiduciary duty under Louisiana law, [plaintiff] must first prove the existence of a fiduciary duty on the part of [defendant]." *See, e.g, Omnitech*, 11 F.3d at 1330.  Accordingly, plaintiff's claim for breach of fiduciary duty against Emile Robichaux is dismissed.

### G.   Tortious Interference with Business Relations

A plaintiff bringing a claim for tortious interference with business relations must show "by a preponderance of the evidence that the defendant improperly influenced others not to deal with the plaintiff." *Junior Money Bags, Ltd. v. Segal*, 970 F.2d 1, 10 (5th Cir. 1992)).  The Fifth Circuit has also held that Louisiana jurisprudence requires plaintiffs to plead malice in their complaints. *See, e.g., Dussouy v. Gulf Coast Inv. Corp.*, 660 F.2d 594, 602 (5th Cir. 1981) ("malice is a necessary element of the cause of action"); *Dorsey v. Northern Life Ins. Co.*, 2005 WL 2036738, *16 (E.D. La. 2005) (plaintiff must allege "that a defendant maliciously attempted to prevent a third party from dealing with the plaintiff."); *see also Brown v. Romero*, 922 So. 2d 742 (La. App. 2006) (quoting *JCD Mktg. Co. v. Bass Hotels & Resorts, Inc.*, 812 So. 2d 834, 841 (La. App. 2002)) ("Louisiana courts have limited this cause of action by imposing a malice element, which requires that the plaintiff show the defendant acted with actual malice.").

Plaintiff has not alleged malice in its complaint. (*See*

Compl. ¶¶ 62-63) (alleging that defendants "wrongfully interfered with L-3's business relations"). Ordinarily, the failure to plead malice does not warrant dismissal of a claim, but requires that the complaint be amended. In this case, the deadline for amending pleadings pursuant to Federal Rule of Civil Procedure 15(a) has passed. Further, in its opposition to defendants' motion for partial summary judgment, plaintiff does not point to any conduct by defendants evidencing their malicious attempt to prevent third parties from dealing with L-3. *See Dorsey*, 2005 WL 2036738 at 15. Plaintiff simply re-avers the allegedly improper conduct of defendants in copying and retaining L-3's data. Further, plaintiff's citation to *NCH Corp.* is inapposite because the case does not address tortious interference with business relations. In fact, the Louisiana Fourth Circuit Court of Appeals has noted that "there appear to be no reported cases in which anyone actually has been held liable for the tort." *JCD Marketing Co.*, 812 So. 2d at 841 (quoting George Denegre, Jr., et al., *Tortious Interference and Unfair Trade Claims: Louisiana's Elusive Remedies for Business Interference*, 45 Loy. L. Rev. 395, 401 (1999)). Accordingly, plaintiff's claims for tortious interference with business relations are dismissed.[14]

---

[14] The Court notes that a claim for tortious interference with business relations is distinct from that of tortious interference with contract. *See Restivo v. Hanger Prosthetics &*

31

**H.   Injunctive Relief**

The party seeking a permanent injunction must establish (1) success on the merits; (2) that a failure to grant the injunction will result in irreparable injury; (3) that said injury outweighs any damage that the injunction will cause the opposing party; and (4) that the injunction will not disserve the public interest. *VRC LLC v. City of Dallas*, 460 F.3d 607, 611 (5th Cir. 2006).  At this stage there is no resolution regarding L-3's success on the merits of its remaining claims, therefore it is premature for the Court to rule on L-3's request for injunctive relief.

**IV.  CONCLUSION**

For the foregoing reasons, plaintiff's motion to dismiss pursuant to Rule 56(f) and defendants' motion for partial summary judgment are GRANTED IN PART and DENIED IN PART. Plaintiff's claims that defendants violated the CFAA, LUTSA, that Emile Robichaux breached his employment agreement and

---

*Orthotics, Inc.*, 483 F. Supp. 2d 521, 537 (E.D. La. 2007).  To the extent that plaintiff is claiming that defendants tortiously interfered with its contracts, the facts of this case do not support such a claim.  The Louisiana Supreme Court has recognized a limited cause of action for the breach of duty by a corporate officer to refrain from intentionally and unjustifiably interfering with a contractual relationship between the officer's corporate employer and the particular plaintiff. *See 9 to 5 Fashions Inc. v. Spurney*, 538 So. 2d 228 (La. 1989).  Those circumstances do not exist in this case.

breached a fiduciary duty, and that defendants tortiously

interfered with L-3's business relations are dismissed.


        New Orleans, Louisiana, this  29th  day of February, 2008.


                          _____
                               SARAH S. VANCE
                          UNITED STATES DISTRICT COURT

33